(No. 88-CC-1121– )

JOSEPH P. KOWASZ, Individually, and as Administrator of the Estate of KEVIN KOWASZ, Deceased, CYNTHIA KOWASZ and MELISSA KOWASZ, a Minor, by JOSEPH KOWASZ, her Father and Next Friend, Claimants, v. THE STATE OF ILLINOIS, Respondent.

*Order filed January 12, 1994.*

*Opinion filed January 9, 1998.*

ALBERT KORETZKY, for Claimant.

JAMES E. RYAN, Attorney General (DAVID S. RODRI-GUEZ, Assistant Attorney General, of counsel), for Respondent.

## ORDER

FREDERICK, J.

This matter comes before this Court on Respondent, State of Illinois, Department of Transportation's motion to dismiss the complaint and this Court, being fully advised in the premises, hereby finds as follows:

At the time of the accident, the location at which Claimant alleges negligence occurred was not under the jurisdiction of the State of Illinois. The Court of Claims Act, as well as the administrative rules of the Court of Claims, require that a Claimant exhaust all judicial remedies prior to bringing a claim before this Court.

In the instant case, as noted above, the location of the accident was not under the jurisdiction of the State of Illinois. Thus, Claimants are obligated to initially seek a remedy with respect to the entity which did have jurisdiction. Claimants have not done so.

Therefore it is ordered, adjudged and decreed that the Respondent's motion to dismiss is granted, and that this action is dismissed, with prejudice.

## OPINION

Frederick, J.

Claimants, Joseph Kowasz, administrator of the estate of Kevin Kowasz, deceased, Cynthia Kowasz and Melissa Kowasz, a minor, by Joseph Kowasz, her father and next friend, filed their claim sounding in tort in the Court of Claims on October 28, 1987. Claimants allege that, on December 13, 1985, Kevin Kowasz was killed and Cynthia Kowasz and Melissa Kowasz were severely injured due to the State's negligent maintenance and operation of Rodenburg Road near its intersection with Irving Park Road in Roselle, Cook County, Illinois. Claimants have alleged that the State knew that said intersection was extra hazardous to the driving public and particularly to vehicles proceeding southerly and northerly on Rodenburg Road at the intersection with Irving Park Road.

### The Facts

On December 13, 1985, Cynthia Kowasz, a resident of Hanover Park, drove her car into the intersection of Illinois Route 19 and Rodenburg Road in Schaumburg, Illinois. At that time, her Chevrolet Chevette was struck broadside by an eastbound vehicle on Route 19. Kevin Kowasz, Cynthia's two-year-old son, was sitting in the front passenger seat. Claimant, Melissa Kowasz, an eight-year-old daughter, was seated in the rear seat. As a result of the impact, Kevin Kowasz died of head injuries two days later. Both of the vehicles involved were totally destroyed. This action was brought on behalf of the estate of Kevin Kowasz by his father and by Cynthia and Melissa Kowasz, individually.

At the time of the collision, Route 19 and Rodenburg Road intersected at right angles with one lane of traffic on each road for each direction. There was north-south traffic on Rodenburg Road and east-west traffic on

Route 19. The State admits it was in control of this intersection. There were stop signs for the vehicles on Rodenburg Road and the speed limit for Route 19 was 45 miles per hour. The evidence reveals that the volume of traffic on Route 19 made the intersection dangerous to vehicles in all directions. Furthermore, the Illinois Department of Transportation had known of the problem for years before the Kowasz vehicle was involved in the collision before the Court.

Located adjacent to the intersection on the northwest corner was the Chicago area office of AMP Incorporated, a Pennsylvania company. In August of 1983, the regional office manager of AMP, Mr. John W. Mercer, sent a letter to the district engineer of IDOT expressing a deep concern for the safety of all occupants of vehicles which used that intersection, and, specifically, for the safety of his employees who entered the intersection after exiting the building. Mr. Mercer occupied an office which afforded him a direct view of the intersection and he told the engineer that,

"Daily I hear numerous screeching of tires and see numerous near misses at this intersection. During the past month, four AMP employees, myself included, have come literally within inches of injury or possible death exiting to Irving Park Road * * * I cannot stress my concern in regard to safety of my employees and the public on Irving Park Road enough."

In response, Mr. Mercer received a letter from IDOT indicating that the intersection should be realigned and channelized, requiring land acquisition. Nothing was done to improve the safety of this intersection after Mr. Mercer's letter.

As it turned out, this was not the first written warning the State had received regarding the dangers of this intersection. In March of 1983, the Village of Schaumburg director of engineering expressed his concerns for the safety of the public in general and the employees of AMP as they entered that intersection. Obviously, Mr. Mercer had been

contacting other governmental agencies before he wrote the State. In response to this letter, the speed limit on Illinois Route 19 was reduced from 50 miles per hour to 45 miles per hour. Additionally, the State, after reviewing traffic volume at the intersection, concluded that traffic signals were needed at the intersection. On August 26, 1983, a service inquiry was made by an IDOT employee, Robert Murzyn, who lived within blocks of the intersection. In his inquiry, Mr. Murzyn informed IDOT that on the previous evening, he was awakened by an accident at the intersection and he called the local police. Mr. Murzyn also stated that it was the sixth such accident which had awakened him in the previous eight months. He further indicated that this inquiry was not the first time he had mentioned the intersection to IDOT employees, but that no steps had been taken to make the intersection safer.

In October of 1983, the Village of Schaumburg, through its director of engineering, informed the State that the Village did not believe an application for federal matching funds would be appropriate under the circumstances presented. It also pointed out to the State that Schaumburg did not control the complete intersection and that matching funds by the other governmental entity would be highly unlikely. The engineer also suggested that the State and Village continue to monitor this intersection with the hope that safety funding could be approved within the next 12 months. This letter was in response to an IDOT suggestion regarding the pursuit of financing for the intersection. In November of 1983, the State wrote Schaumburg again, requesting it to reconsider its position on funding, suggesting that Schaumburg could prepare the necessary documents in a shorter time than the State.

In the spring of 1984, communications occurred between the local State representative and IDOT. Who

instigated those communications is unclear from the record. It is clear, however, that the previous correspondence relative to the location was provided to the State representative and that a district engineer told her that traffic signals were warranted and needed at that location. In May of 1984, the Department reviewed the accident statistics for that location for a period of five years. In a memo dated May 21, 1984, an IDOT official warned of the large number of right angle collisions and the rising number of total collisions at that intersection. He urged that the State should not wait for the Village of Schaumburg to sponsor an improvement before the Department of Transportation took action, predicting that the likelihood of a serious collision was very great at this intersection with the high speed limit on Irving Park Road. Also in May of 1984, a meeting took place between representatives of AMP Incorporated and representatives of the Village of Schaumburg. Afterwards, Mr. Mercer sent a letter to Schaumburg which memorialized the conversation that took place during that meeting and the IDOT engineering department and the Illinois State Representative were copied on that letter. It is clear from the letter that the discussions which took place included the review of the possibility of installing traffic signals at the intersection. The State's position that geometric improvements would have to be made before the State would consider the installation of a temporary traffic signal was articulated to the representatives of the corporation. The cost of making these changes was discussed and the representatives of AMP Incorporated even considered that the company might be willing to contribute to those costs. While the record is unclear whether the company ever followed through on a specific commitment, the discussion by a private entity to contribute to a State improvement for safety purposes highlights the concern

which these people had for the safety problems at the location. Also by May of 1985, another State Representative was in contact with the Illinois Department of Transportation, requesting information and status on the installation of temporary traffic signals at the location. The district engineer for IDOT, in response to that request, indicated that, without support from the local municipalities, temporary widening of Illinois Route 19 prevented the use of temporary signals and the State could not expect approval for permanent realignment and signals until fiscal year 1988. However, this position evidently changed in the ensuing months. By October of 1985, the same state engineer informed the State Representative that the Department had decided to proceed with the installation of temporary signals without interim widening work, and that such installation would be operational by December 31, 1985. While this was occurring, Illinois State police had started to direct traffic at the intersection during rush hours because of the traffic volume at the intersection. Construction on nearby Roselle Road had forced even more traffic onto Irving Park Road, mandating police intervention at the intersection. As of October 31, 1985, the Department of Transportation recommended continued police presence at the intersection during peak hours until the temporary signals were installed. On the date of the accident, there were no police at the intersection of Illinois 19 and Rodenburg Road. The record contains no explanation for their absence in spite of the IDOT recommendation that police be present during the peak traffic hours.

Kevin Kowasz was killed as a result of the collision. Cynthia Kowasz suffered a fracture of her pelvis, bladder contusions, low back injuries, and psychological difficulties. The total medical bills for Cynthia Kowasz related to this collision totaled $3,258.01. She also had a loss of

earnings totaling $2,475, as she was off work for seven weeks. Melissa Kowasz suffered multiple bruises and psychological difficulties as a result of the collision. Her total medical expenses were $440.

During oral arguments, counsel for Claimants indicated that Kevin Kowasz's case was settled for more than $100,000 and that his claim was now moot in this Court. Additionally, Claimants' counsel indicated at trial that the death case was settled with Mr. Hodges' insurance company and an underinsured motorist coverage for over $200,000.

Claimant, Cynthia Kowasz, was going south on Rodenburg Road. She stopped at the stop sign and waited about five minutes for traffic to clear so she could get across Route 19. She looked both ways and eventually saw no traffic to her left and only one car approaching on her right. The car on her right was by a billboard. She believed she had enough time to cross the intersection. However, as she pulled out and looked again to the right, the headlights were right on top of her. She screamed and was then knocked unconscious. She was taken to Alexian Brothers Hospital and later to Lutheran General Hospital. Claimant had four fractures in her pelvic area. She was released on the 16th. She was unable to work. She went from a wheelchair, to crutches, to a cane. She was in a wheelchair for two weeks. Claimant testified to great pain and the inability to sleep during part of her recovery period. It took her two months to walk without the assistance of crutches or a cane. She also attended a group for bereaved parents for seven years. At the time of trial, she complained of occasional problems with her pelvis requiring chiropractic aid.

Claimant, Melissa Kowasz, had to be pulled out of the car. She was knocked unconscious. When she came to, she started crying. She sustained scratches and bruises

on her face and feet. She also saw a psychiatrist to deal with the loss of her brother.

## The Law

The Court must first note that the Respondent has failed to file any affirmative defenses and failed to dispute any of the five requests to admit facts filed by Claimants. This Court has repeatedly held that the State is not an insurer of persons traveling upon its highways, but the State does owe persons traveling on its highways the duty of ordinary care in the maintenance of its highways. In order to recover on a claim of negligence, the Claimants must establish by a preponderance of the evidence that there was negligence on the part of the State, that the negligence was the proximate cause of the injury, and that the Claimant was not contributorily negligent. (*Pochis v. State* (1993), 46 Ill. Ct. Cl. 1.) Further, in order to prevail on a claim of negligent highway maintenance, a Claimant has the burden of proving that the State had actual or constructive notice of the dangerous condition. (*Crowell v. State* (1994), 46 Ill. Ct. Cl. 211.) The mere fact that a dangerous condition existed is not sufficient to constitute an act of negligence by the State. *Ott v. State* (1994), 47 Ill. Ct. Cl. 231.

The condition at the intersection at issue in this case was known to a number of IDOT employees for a significant time prior to the date of the accident. Only the State had the ability to effectively reduce the risks of entering the intersection. In the face of numerous and varied warnings that the intersection was dangerous, the State did little to lessen the danger except to reduce the speed limit five miles per hour on Route 19. The statistical data alone provided to the State indicated that the risk was increasing as the expansion of that area of the township increased. Something as simple as a further reduction of the speed limit on Route 19 might have decreased accidents at that

intersection. Temporary signals which had been rejected in 1983 and 1984 were approved in the fall of 1985. On February 7, 1986, those signals, which had been considered inappropriate, were turned on with various State officials present. Unfortunately, for the Kowasz family, those signals were a few days late.

It cannot be said that the State reacted in a reasonable manner and fashion to the alarm raised by numerous individuals regarding the safety of this intersection. This Court has long held that while the State is not an insurer of the safety of the persons and the lawful use of the highways, it nevertheless has certain duties regarding dangerous conditions of which it has notice. The evidence in this case establishes that the intersection of Rodenburg Road and Route 19 was dangerous. The evidence and admissions further establish that the State had actual notice of this condition.

The area of concern for the Court is that there is no evidence before the Court as to just what it was that made the intersection dangerous. The most likely prospect is that because of the increasing amount of traffic on Route 19, those drivers on Rodenburg Road would become impatient trying to enter the intersection after stopping at their stop sign and trying to enter the intersection when it was not safe to do so.

In light of the traffic laws which require a driver at a stop sign to yield to approaching traffic which does not have a stop sign at an intersection, it is very hard to understand why the State did not plead an affirmative defense of the negligence of the driver of the Kowasz vehicle.

Having said this, we again note that Respondent failed to raise an affirmative defense and failed to dispute the five requests to admit which had the effect of establishing Claimants' case. We, therefore, find that the State was negligent.

Based on the evidence presented, we find that the damages proved as to Claimant, Cynthia Kowasz, are as follows:

| | |
|---|---|
| (a) Medical bills | $ 3,258.01 |
| (b) Lost earnings | $ 2,475 |
| (c) Pain & suffering | $46,000 |

We find that the damages proved as to Claimant, Melissa Kowasz, are as follows:

| | |
|---|---|
| (a) Medical bills | $ 440 |
| (b) Pain & suffering | $ 4,000 |

Based on the foregoing, it is hereby ordered:

A. That the claim of Joseph Kowasz, administrator of the estate of Kevin Kowasz, deceased, is dismissed and stricken with prejudice.

B. That Claimant, Cynthia Kowasz, is awarded $51,733.01 in *full satisfaction of her claim.*

C. That Claimant, Melissa Kowasz, now an adult, is awarded $4,440 in full satisfaction of her claim.